RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0213p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

FINDLAY TRUCK LINE, INC.,
      *Plaintiff-Appellee/Cross-Appellant,*

      *v.*

CENTRAL STATES, SOUTHEAST & SOUTHWEST
AREAS PENSION FUND,
      *Defendant-Appellant/Cross-Appellee.*

Nos. 12-3450; 12-3531

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 3:11-cv-02396—Jack Zouhary, District Judge.

Argued: January 22, 2013

Decided and Filed: August 9, 2013

Before: SUHRHEINRICH, MOORE and GIBBONS; Circuit Judges.

_____

## COUNSEL

**ARGUED:** Brad R. Berliner, CENTRAL STATES FUNDS, Rosemont, Illinois, for Appellant. Tracy L. Turner, HABASH & REASONER, LLP, Columbus, Ohio, for Appellee. **ON BRIEF:** Brad R. Berliner, Edward H. Bogle, John Joseph Franczyk, Jr., CENTRAL STATES FUNDS, Rosemont, Illinois, for Appellant. Tracy L. Turner, W. Irl Reasoner, HABASH & REASONER, LLP, Columbus, Ohio, for Appellee.

_____

## OPINION
_____

SUHRHEINRICH, Circuit Judge.

## I.  Introduction

Plaintiff-Appellee/Cross-Appellant Findlay Truck Line ("Findlay") brought this action seeking relief from a withdrawal liability payment it allegedly owes to Defendant-Appellant/Cross-Appellee Central States, Southeast and Southwest Areas Pension Fund ("the Fund") under the  Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. §§ 1381-1461.  Findlay was involved in a labor dispute, and as a result, ceased making contributions to a pension plan administered by the Fund. Shortly thereafter, the Fund demanded Findlay pay withdrawal liability in excess of $10 million pursuant to the MPPAA.  Findlay then filed a complaint in federal district court seeking declaratory and injunctive relief to prevent such payment, arguing that the Fund's assessment of withdrawal liability was improper.  Findlay made three arguments in front of the federal district court.  First, Findlay contended that withdrawal liability was improper because the withdrawal occurred as the result of a labor dispute.  Second, Findlay contended that despite the MPPAA's arbitration requirement, it should not be forced to arbitrate the dispute because the withdrawal was "union-mandated."  Lastly, Findlay contended that despite the MPPAA's interim payment requirement, it should not be forced to make interim payments because it would suffer irreparable harm if made to do so.

The district court dismissed the case, holding that the MPPAA required the dispute be arbitrated.  The district court also issued an injunction enjoining the Fund from collecting withdrawal liability payments pending arbitration, finding that such payments would cause irreparable harm to Findlay.  The Fund appeals the district court's injunction, and Findlay cross-appeals the district court's dismissal.  For the reasons set forth below, we REVERSE the injunctive order but AFFIRM the dismissal.

## II. Background

### A.    Statutory Background

We begin with a brief overview of the statutory scheme that governs employee pension benefits because it is central to the case. In 1974, Congress enacted the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 101-1371 ("ERISA"), to ensure that "if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." *Nachman Corp. v. Pension Ben. Guar. Corp.,* 446 U.S. 359, 375 (1980). ERISA also created a plan termination insurance program, administered by the Pension Benefit Guaranty Corporation ("PBGC"), a wholly-owned government corporation within the Department of Labor. 29 U.S.C. § 1302. The plan termination insurance program required that the PBGC collect insurance premiums from covered pension plans and provide benefits to participants in those plans if their plans terminate with insufficient assets to support its guaranteed benefits. *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1985).

However, it soon became apparent that the PBGC would be overwhelmed by obligations in excess of its capacity, because a significant number of multiemployer plans were experiencing extreme financial hardship. *Id.* at 721. In response, Congress directed the PBGC to prepare a comprehensive report analyzing the financial hardship problems faced by the multiemployer plans and to recommend appropriate legislative action. *Id.* at 722. The PBGC issued its report on July 1, 1978. *Id.* at 722. Among its findings was that ERISA failed to address the adverse consequences that occurred when an employer withdrew from a multiemployer pension plan:

> A key problem of ongoing multiemployer plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels. . . . The rising costs may encourage—or force—withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing

> contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue.

*Id.* at 722 n.2 (quoting *Pension Plan Termination Insurance Issues: Hearings before the Subcommittee on Oversight of the House Committee on Ways and Means*, 95th Cong., 2nd Sess., 22 (1978) (statement of Matthew M. Lind)), "To alleviate the problem of employer withdrawals, the PBGC suggested new rules under which a withdrawing employer would be required to pay whatever share of the plan's unfunded vested liabilities was attributable to that employer's participation." *R.A. Gray & Co.*, 467 U.S. at 723. On September 26, 1980, Congress enacted the MPPAA based on this recommendation. 29 U.S.C. §§ 1381-1461. The MPPAA provides a statutory scheme that is both "lengthy and complex." *Marvin Hayes Lines, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 814 F.2d 297, 299 (6th Cir. 1987). Four principles of the MPPAA are especially relevant to the dispute before us.

The first principle is that an employer withdrawing from a fund must make withdrawal liability payments. An employer is defined to have completely withdrawn from a fund when it "permanently ceases to have an obligation to contribute under the plan" or "permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a). Any employer withdrawing from a multiemployer plan must make a payment of "withdrawal liability," which is calculated as the employer's proportionate share of the plan's unfunded, unvested benefits. 29 U.S.C. § 1381(a). The MPPAA provides that once a fund determines that an employer has withdrawn from its plan, it must notify the employer of the amount of the liability, prepare a schedule for liability payments,[1] and demand payment in accordance with the schedule. 29 U.S.C. §§ 1382, 1399(b)(1).

---

[1] The "schedule" described in this provision is a schedule which the fund is required to provide to the employer under 29 U.S.C. § 1399(b)(1). A formula determining this schedule is prescribed as the average annual number of contribution base units (*e.g.*, hours worked or weeks worked) for the three consecutive plan years during the ten consecutive plan year period ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan were the highest, multiplied by the highest contribution rate at which the employer had an obligation to contribute under the plan during the ten plan years ending with the plan year in which the withdrawal occurred. 29 U.S.C. § 1399(c)(1)(C). There is also a twenty-year payment cap so that the employer's liability is limited to the first twenty annual payments. § 1399(c)(1)(B).

A second key principle of the MPPAA is that even if an employer disputes the withdrawal liability payments, the employer must make payments to the fund no later than 60 days after the fund demands such payments, and must continue to make them until the dispute has been resolved. Specifically, the MPPAA states that:

> Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) of this section beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.

29 U.S.C. § 1399(c)(2). The MPPAA repeats this requirement in a subsequent section, providing that "[p]ayments shall be made by the employer . . . until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination." 29 U.S.C. § 1401(d). We have referred to these payments as "interim payments," and referred to this process as "pay now, dispute later." *Mason & Dixon Tank Lines, Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 852 F.2d 156, 165 (6th Cir. 1988). The congressional intent behind "pay now, dispute later" is to alleviate the risk that during the course of arbitration, an employer will become insolvent, and the fund will not be able to collect in the event of a favorable award. *Trs. of the Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Cent. Transp., Inc.*, 935 F.2d 114, 118-19 (7th Cir. 1991). As the Seventh Circuit explained:

> Many [employers] are small and thinly capitalized. During the time consumed by the arbitration and any proceedings to review or enforce the award, some will go out of business. . . . Although the [fund] bears substantial risk if the employer holds the stakes pending final resolution, the employer faces no corresponding risk if the fund holds the stakes. Pension funds are solvent, diversified, regulated institutions. . . . [F]unds will be able to repay any withdrawal liability that a court or arbitrator ultimately determines they should not have collected.

*Id.* (internal citations omitted).

A third key principle is that disputes over withdrawal liability between an employer and a fund must be arbitrated. The MPPAA provides detailed instructions for dispute resolution, in recognition that "the employer and the Plan may not always be in agreement as to the computation of withdrawal liability." *Marvin Hayes*, 814 F.2d at 299. If either party disputes the liability, the MPPAA requires that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1). Congress intended the arbitration provision to promote "judicial economy and judicial restraint." *Mason & Dixon*, 852 F.2d at 164 (citing *Flying Tiger Line v. Teamsters Pension Trust Fund*, 830 F.2d 1241, 1248 (3d Cir. 1987) (quoting *Robbins v. Chipman Trucking, Inc.,* 693 F.Supp. 628, 635 (N.D. Ill. 1986))). "The arbitrator's decision may dispose of the dispute, pare down the issues for judicial determination, or simply provide a factual record for effective resolution of the issues." *Id.*

The last key principle is that "an employer shall not be considered to have withdrawn from a plan solely because . . . an employer suspends contributions under the plan during a labor dispute involving its employees." 29 U.S.C. § 1398(2). This principle is important because labor unions are often involved in alleged withdrawals, if only because employers' obligations to pension funds often arise under collective bargaining agreements with their employees' labor unions. Congress intended this provision to "protect an employer from the threat of withdrawal liability for [the] time period during which its contributions have been *temporarily* interrupted by labor problems." *Combs v. Adkins & Adkins Coal Co., Inc.*, 597 F. Supp. 122, 126 (D.D.C. 1984) (citing *I.A.M. Nat'l Pension Fund, Ben. Plan C v. Schulze Tool and Die Co., Inc.*, 564 F. Supp. 1285, 1295 (N.D. Cal. 1983)).

In short, four principles of the MPPAA are at issue: (1) an employer withdrawing from a fund must make withdrawal liability payments to the fund; (2) even if there is a dispute between an employer and the fund over withdrawal liability, the employer must nonetheless make interim payments to the fund until the dispute has been resolved; (3)

an employer and a fund disputing withdrawal liability must do so in arbitration; and (4) an employer that temporarily suspends payments due to a labor dispute is not deemed to have withdrawn. With this statutory background in mind, we turn to the facts of the case before us.

## B.   Factual Background

Findlay is an Ohio corporation with fewer than twenty employees, all of whom are represented by Local 20 of the International Brotherhood of Teamsters ("Local 20"). For over 40 years, Findlay had been participating in the multiemployer pension plan administered by the Fund. Findlay had been making contributions on behalf of its employees pursuant to a series of collective bargaining agreements with Local 20, under which the Local 20-represented employees were enrolled as employee participants in the plan. On June 19, 2011, Local 20 initiated a strike against Findlay, and Findlay stopped making contributions to the Fund. On September 26, 2011, the Fund sent notice to Findlay stating that "your company may have withdrawn" from the Fund. Findlay responded that it had not withdrawn and that it would resume contributions as soon as the strike ended.

On September 28, 2011, Local 20 notified Findlay that it "disclaimed" interest in the Teamsters-represented employees of Findlay. Findlay filed a claim with the National Labor Relations Board ("NLRB") contending that the disclaimer of interest constituted unfair labor practices. Local 20 responded to the charge, but Findlay withdrew it without comment on December 20, 2011, before the NLRB had reached any decision. Shortly thereafter, on January 4, 2012, Findlay filed another unfair labor practice charge against Local 20, making the same basic allegations, and Local 20 responded. On March 21, 2012, the NLRB dismissed Findlay's charge, and Findlay did not appeal the decision.

In response to Local 20's disclaimer of interest in Findlay's employees, the Fund determined that Findlay's obligation to make pension contributions under the collective bargaining agreements had ceased, and therefore, Findlay had withdrawn from the Fund.

29 U.S.C. § 1383(a) ("An employer is defined to have completely withdrawn from a fund when it . . . permanently ceases to have an obligation to contribute under the plan. . . .")  On October 13, 2011, the Fund issued a notice and demand for payment of withdrawal liability in the amount of $10,164,531.55 pursuant to the MPPAA. § 1381(a).

On November 4, 2011, Findlay filed a complaint in the United States District Court for the Northern District of Ohio, alleging that (1) the Fund's assessment of withdrawal liability was improper because Local 20's disclaimer of interest was "inappropriate and contrary to law"; (2) Findlay was not obligated to make interim payments, despite the language of the MPPAA, because making such payments would cause irreparable harm; and (3) arbitration pursuant to the MPPAA was not necessary because the district court could determine all the factual and legal issues involved.

The Fund filed a motion to dismiss or alternatively, to transfer venue.  In support, the Fund made three principal arguments: (1) that the case should be dismissed under Rule 12(b)(6), because Findlay was bound by a contractual forum-selection clause designating the United States District Court for the Northern District of Illinois as the proper forum; (2) that the case should be dismissed because Findlay's claims regarding withdrawal liability were subject to mandatory arbitration under the MPPAA; and (3) that, in the alternative, the case should be transferred to the United States District Court for the Northern District of Illinois.  On February 1, 2012, Findlay filed its response to the Fund's motion.  Findlay argued that the case should not be arbitrated because arbitration would subject Findlay to irreparable harm, and also that because the company's withdrawal was "union-mandated," it presented issues over which arbitrators would not have special expertise.  In this response motion, Findlay did not specifically request an immediate injunction enjoining the Fund from collecting interim payments.

The issue of an injunction arose during a hearing on the motion to dismiss, when the district court asked the Fund if it was requesting a hearing on whether Findlay would suffer irreparable harm if forced to "pay now, dispute later."  The Fund responded that

a hearing was not necessary because as a matter of law, Findlay would need to establish both irreparable harm *and* that the Fund's claim for withdrawal liability was frivolous, the latter of which was not alleged.  For this interpretation of law, the Fund relied on case law from the Fifth and Seventh Circuits.[2]

On March 21, 2012, the district court issued its opinion and order.  First, the district court dismissed Findlay's complaint on the grounds that the dispute, including the issue of Local 20's disclaimer of interest, should have been arbitrated under the MPPAA before it was brought to federal court.  In support of its dismissal, the district court relied on § 1401(a) of the MPPAA, which, as noted above, states that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan . . . shall be resolved through arbitration."  The district court acknowledged that there were certain exceptions to this arbitration requirement, such as where the arbitrator does not possess special expertise, where arbitration would not promote judicial economy, where deference to the statutory record is not necessary, and where arbitration would not develop a helpful record, citing *Dorn's Transp., Inc. v. Teamsters Pension Trust Fund,* 787 F.2d 897, 903 (3d Cir. 1986); *T.I.M.E.-DC v. Mgmt.-Labor Welfare & Pension Funds*, 756 F.2d 939, 945 (2d Cir. 1985).  However, the district court ruled summarily that none of the exceptions applied to Findlay.

Second, the district court issued an injunction under Federal Rule of Civil Procedure 65, enjoining the Fund from collecting any withdrawal liability from Findlay until the matter was resolved in arbitration.  In issuing the injunction, the district court began by acknowledging the  general "pay now, dispute later" rule, citing § 1399(c)(2) of the MPPAA and *Marvin Hayes,* which states that "during the pendency of any dispute . . . interim payments of withdrawal liability must be made. . . ."  *Marvin Hayes*, 814 F.2d at 299.  However, the district court ultimately held that "there is an exception when an interim payment causes irreparable harm to the employer," relying on *Mason &*

---

[2]The issue of whether irreparable harm alone is sufficient is addressed at length in Part IV of this Opinion.  Here, suffice it to say that the disagreement in the district court was over Sixth Circuit case law, not disagreement about Findlay's financial condition.

*Dixon*, 852 F.2d at 165.  In *Mason & Dixon,* we explained as part of our procedural posture that in a previous holding, we had "affirmed the district court's injunction prohibiting [a fund] from collecting interim payments of withdrawal liability" based on irreparable harm.  *Id.* (referring to the holding of *Cent. Transp., Inc. v. Cent. States Se. & Sw. Areas Pension Fund*, 816 F.2d 678 (6th Cir.) (per curiam) (unpublished opinion), *cert. denied*, 484 U.S. 926 (1987)).  The district court explained that irreparable harm is defined to exist if the interim payments would "seriously inhibit the ability of [employers] to operate and quite likely [] result in their demise," citing *Mason & Dixon*, 852 F.2d at 165 (citations omitted).  Using this definition as a guideline, the district court determined that Findlay would suffer irreparable harm if forced to make interim payments:

> Plaintiff is a small operation with less than 20 union employees and has not conducted delivery operations since the labor dispute began in June 2011. Additionally, Plaintiff has had a net loss in four of the last five years.  Plaintiff is in financial distress but intends to resume operations once the labor dispute is resolved.  However, if required to make the lump sum payment Defendant demands, resumption of operations is unlikely.

Accordingly, the district court issued an injunction enjoining the Fund from seeking interim payments from Findlay.

The Fund appeals the district court's injunction, arguing that because the MPPAA requires that Findlay "pay now, dispute later," the injunction violates the statutory language of the MPPAA.  29 U.S.C. § 1399(c)(2) & 1401(d).[3]  In particular, the Fund argues that although federal courts generally have the equitable authority to issue injunctions per Federal Rule of Civil Procedure 65, the statutory language of the MPPAA divests federal courts of the power to enjoin interim payments, and even a finding of irreparable harm cannot override the language of the statute.  The Fund also

---

[3]As noted above, 29 U.S.C. § 1399(c)(2) states that withdrawal liability "shall be payable in accordance with the schedule set forth by the plan sponsor . . . beginning no later than 60 days after the date of the demand notwithstanding any request for review . . ." and § 1401(d) states that "[p]ayments shall be made by an employer . . . until the arbitrator issues a final decision. . . ."

argues that the district court erred by relying on Findlay's "mere representation that it may face irreparable harm," and also that it erred by entering the injunction "without adequate notice that an injunction might issue, an evidentiary hearing on the question, consideration of a bond, specific findings of fact and conclusions of law, or consideration of the traditional factors of equitable relief."

Findlay cross-appeals, challenging the district court's dismissal, arguing that the district court should have recognized that ordering the case to arbitration would not serve the recognized congressional purposes of the arbitration provision of the MPPAA. Specifically, Findlay argues that because its withdrawal occurred as the result of a labor dispute, it was an allegedly rare occurrence, and therefore "not contemplated" by the MPPAA. At the same time, somewhat contradictorily, Findlay argues that its dispute qualifies for § 1398 of the MPPAA, which exempts employers from withdrawal liability when the employer suspends contributions during a labor dispute. Lastly, Findlay points out that we have already made a few exceptions to the arbitration requirement, citing *Cent. States Pension Fund v. 888 Corp.*, 813 F.2d 760, 764 (6th Cir. 1987), and argues that we should create a new exception for "union-mandated withdrawals."

## III.  Jurisdiction

Jurisdiction was proper in the district court pursuant to 28 U.S.C. §§ 1331 & 2201 and 29 U.S.C. §§ 1132 & 1451. Jurisdiction is proper in this court pursuant to 28 U.S.C. § 1291.

## IV.  Analysis

There are two issues before us: (A) the question posed by the Fund on appeal, of whether the district court had the authority to issue the injunction under the MPPAA and the Federal Rules of Civil Procedure, and (B) the question posed by Findlay on cross-appeal, of whether the district court erred by dismissing the case and ordering it to

arbitration. We review a district court's grant of a preliminary injunction[4] under an abuse of discretion standard. *Washington v. Reno*, 35 F.3d 1093, 1098 (6th Cir. 1994). We review a district court's grant of a motion to dismiss under a *de novo* standard. *Pedreira v. Ky. Baptist Homes for Children, Inc.*, 579 F.3d 722, 727 (6th Cir. 2008).

## A.    Injunction

As a general matter, federal courts have the power to issue preliminary injunctions pursuant to Federal Rule of Civil Procedure 65 and the court's equitable powers. *Grupo Mexicano de Desarrollos S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999) (holding that "the general availability of injunctive relief [is] not altered by [Rule 65] and depend[s] on traditional principles of equity jurisdiction") (quotations and citations omitted). The issue here is whether this equitable power is abrogated by the statutory language of the MPPAA, which specifically mandates that interim payments be made. 29 U.S.C. § 1399(c)(2).

Both parties contend that this court has already resolved the issue. Findlay argues that in *Mason & Dixon,* we held that interim payments do not have to be made if they cause irreparable harm to the employer. The Fund counters that in *Marvin Hayes*, we held that interim payments must always be made. But for the reasons set forth below, we hold that neither case offers the clarity afforded to it by the parties, and neither case is dispositive on whether we recognize any equitable exceptions to "pay now, dispute later."

---

[4]The district court did not specify whether the injunction was preliminary under Federal Rule of Civil Procedure 65(a) or permanent under Federal Rule of Civil Procedure 65(d), a specification that becomes relevant for only two reasons. First, while a preliminary injunction is reviewed under an abuse of discretion standard, a permanent injunction is reviewed for clear error for factual findings, *de novo* for legal conclusions, and for abuse of discretion for the scope of the relief. *S. Cent. Power Co. v. Int'l Bhd. of Elec. Workers, Local 2359,* 186 F.3d 733, 737 (6th Cir. 1999) (citation omitted). Second, a preliminary injunction requires that the court consider whether to require a bond. *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978).

In determining the nature of the injunction, we consider the "actual effect" of the injunction, "rather than the district court's characterization of it." *United States v. Bayshore Assoc., Inc.*, 934 F.2d 1391, 1395 (6th Cir. 1991). Here, the effect of the district court's injunction is to maintain the status quo between Findlay and the Fund until the time the arbitrator issues an award on the merits of the case. This is consistent with the purpose of a preliminary injunction, which "is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Therefore, we consider the injunction to be preliminary.

### 1.    *Mason & Dixon*

In *Mason & Dixon*, Mason and Dixon Tank Lines, Inc. ("Tank Lines"), a subsidiary of Mason and Dixon, Inc., had a number of terminals, each covered by a separate collective bargaining agreement with local unions. *Mason & Dixon*, 852 F.2d at 160. The collective bargaining agreements required that Tank Lines contribute to a pension fund for the employees. *Id.* The case arose when five employees who comprised a discrete bargaining unit at one of Tank Lines' terminals voted to decertify the union, which resulted in the expiration of their collective bargaining agreement. *Id.* As a result, Tank Lines' obligation with respect to the five employees to contribute to the pension fund ceased, and Tank Lines became liable for withdrawal liability. *Id.* During the same period, Mason and Dixon, Inc. executed two stock purchase agreements with Central Transport, Inc. and its affiliate, GLS LeasCo., Inc. (collectively, "Transport"). Transport acquired the exclusive right to purchase all outstanding shares of Mason and Dixon, Inc.'s stock, as well as that of Tank Lines. *Id.* 160-61. Transport received permanent authority to operate Mason and Dixon, Inc. by the Interstate Commerce Commission a few months later. *Id.* at 161.

In response to Mason and Dixon, Inc.'s new relationship with Transport, the pension fund asserted withdrawal liability against not only Mason and Dixon, Inc., but also Transport and several other companies that were allegedly part of a group of businesses under common control.[5] *Id.* In calculating withdrawal liability, the pension fund considered the fund contribution record of all the alleged members of the controlled

---

[5] The common control provision of the MPPAA is 29 U.S.C. § 1301(b)(1). The nuances of this provision are not relevant to the appeal before us, but a brief explanation of the provision can be found in *Mason & Dixon*, which quotes the words of Senator Williams, a key MPPAA sponsor:

> Under current law, a group of trades or businesses under common control, whether or not incorporated, is treated as a single employer for purposes of employer liability under Title IV. Thus, if a terminating single employer plan is maintained by one or more members of a controlled group, the entire group is the "employer" and is responsible for any employer liability. The leading case in this area is *Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 470 F.Supp. 945 (D.Mass.1979), in which the court correctly held that all members of a controlled group are jointly and severally liable for employer liability under section 4062 [29 U.S.C.A. § 1362] of ERISA.

*Mason & Dixon*, 852 F.2d at 159 n.2 (citing 126 Cong.Rec. S11672 (August 26, 1980)).

group instead of the five-member bargaining unit at Tank Lines. *Id.* The pension fund demanded interim payments. *Id.*

Transport and Tank Lines filed separate actions against the pension fund in district court, seeking injunctive relief to prohibit the pension fund from collecting interim payments pending resolution of their dispute. *Id.* Transport argued that it did not own or control Tank Lines on the date of the withdrawal, and therefore did not constitute an "employer" under the MPPAA. *Id.* Tank Lines argued that the pension fund erroneously calculated the withdrawal liability by including the contribution history of the entire controlled group, instead of including only the contribution history of the five employees who voted to decertify the union. *Id.*

Because the pension fund had made claims against both Mason and Dixon, Inc. and Transport, the district court issued a preliminary injunction prohibiting the pension fund from collecting interim payments by applying the traditional four prong-balancing test and concluding "that the plaintiffs demonstrated a substantial likelihood of success on the merits, because it appeared that the Transport group did not acquire any control over Mason and Dixon and Tank Lines" prior to the withdrawal date; and that "the likelihood of irreparable harm weighed heavily in favor of plaintiffs, since interim payments would impair the credit of the companies, would inhibit their ability to operate, and would be likely to cause their demise." *Id.* at 161-62 (citing *Cent. Transp., Inc. v. Cent. States Se. & Sw. Areas Pension Fund*, 639 F. Supp. 788, 792 (E.D. Tenn. 1986) (*Central Transport I*)). The district court also enjoined the pension fund from commencing arbitration proceedings pursuant to 29 U.S.C. § 1401(a)(1) because it believed that the issue at bar—of whether Transport was an "employer"—was a purely legal statutory interpretation question. *Cent. Transp. I*, 639 F. Supp. at 792-93.

Thereafter, Transport moved for summary judgment, renewing its argument that it was not an "employer" for purposes of the common control provision on the date that the withdrawal occurred. *Cent. Trasp., Inc. v. Cent. States, Se. & Sw. Areas Pension Fund*, 640 F. Supp. 56, 60 (E.D. Tenn. 1986) (*Central Transport II*). The district court

agreed with Transport and granted the motion for summary judgment. The pension fund appealed the district court's grant of summary judgment as well as the injunction barring the collection of interim payments. *Id.* We affirmed in an unpublished opinion without discussion. *Cent. Transp., Inc.*, 816 F.2d at 678 (*Central Transport III*). Thus, Transport was dismissed from the case, leaving only Tank Lines before the district court.

While the appeal was pending, the pension fund deleted the contribution histories of Transport and reduced its withdrawal liability assessment against Tank Lines only. *Mason & Dixon*, 852 F.2d at 162. The pension fund subsequently moved to dissolve the preliminary injunction and also argued that an arbitrator should decide the remaining issues. *Id.* The district court stood by its original irreparable harm finding, but decided that it had the equitable power under 29 U.S.C. § 1451(a) "not to impose withdrawal liability in an arbitrary or capricious fashion or to the extent that it puts Tank Lines' [sic] out of business." *Id.* The court concluded that although withdrawal liability should be imposed, equity required the liability be limited to twenty-five percent of Tank Lines' net worth. Satisfied that this limitation would prevent irreparable harm, the court dissolved the preliminary injunction. *Id*. But the district court did not order the case to arbitration. *Id.*

The pension fund appealed the decision. Because the preliminary injunction had already been dissolved, the only issue on appeal was whether the MPPAA required the dispute to be arbitrated. *Id.* We agreed with the pension fund that arbitration was required, holding that "the issues remaining before the district court must initially be submitted to arbitration under section 1401(a)(1) of the MPPAA" and reversed the district court decision. *Id.*

Findlay reads *Mason & Dixon* to establish an exception to "pay now, dispute later" for irreparable harm. However, Findlay exaggerates the effect of *Mason & Dixon.* First and foremost, any discussion of interim payments in *Mason & Dixon* is dicta. As noted above, *Mason & Dixon* concerned a separate legal question of whether the district court erred when it failed to remand factual and legal issues to arbitration as mandated

by the MPPAA.  *Id.*  Indeed, the court *expressly* declined to address the interim payment question, stating: "We express no opinion on [the employer's] obligation to make interim payments of withdrawal liability."  *Id.* at 168 n. 12.  Therefore, on its face, *Mason & Dixon* does not establish any law concerning "pay now, dispute later."

Second, although in our discussion of *Mason & Dixon*'s procedural history we referenced a prior unpublished opinion that presumed the existence of an equitable exception, we did not explicitly adopt it.  *See id.* at 165 (discussing *Central Transport III*).  As discussed above, in *Central Transport I*, a district court granted a preliminary injunction to prevent the pension fund from collecting interim withdrawal liability payments from the employer.  The district court did so by apparently implicitly assuming that exceptions existed to "pay now, dispute later" and then applying the four-prong balancing test for preliminary injunctions.  *Id.*  In *Central Transport III,* we affirmed without discussion in an unpublished opinion.  *Cent. Transp. III,* 816 F.2d at 678. However, neither case explicitly addresses the permissibility or scope of exceptions to "pay now, dispute later."   And *Mason & Dixon* certainly does not address the permissibility or scope of exceptions in its brief mention of *Central Transport III.*

In sum, *Central Transport III* was an unpublished opinion, decided per curiam, so it is not binding.  *Mason & Dixon* is also not binding on the issue of "pay now, dispute later" because it only ruled on the arbitration issue.  In light of the fact that "we express[ed] no opinion" in *Mason & Dixon* about "pay now, dispute later," we consider next whether the Fund is correct to argue that *Marvin Hayes* provides more guidance.

### 2.    *Marvin Hayes*

The Fund argues that *Marvin Hayes* definitively resolves the issue of interim payments, but *Marvin Hayes* is far from definitive.  In *Marvin Hayes*, the employer plaintiff ("Marvin Hayes") was required to make contributions to a pension fund under a collective bargaining agreement with its employees' union.  *Marvin Hayes*, 814 F.2d at 298.  When the union went on strike, Marvin Hayes stopped making contributions to the pension fund.  *Id.*  The strike ended in a decertification of the union, and the pension

fund notified Marvin Hayes that it had withdrawn from the fund, demanded withdrawal liability, and also demanded interim payments. *Id.*

Marvin Hayes sought review of the demands on the grounds that since it had suspended payments due to a labor dispute, that there had been no withdrawal, relying on 29 U.S.C. § 1398(2) (stating that "an employer shall not be considered to have withdrawn from a plan solely because . . . an employer suspends contributions under the plan during a labor dispute involving its employees"). Marvin Hayes requested arbitration under 29 U.S.C. § 1401 (a) (stating that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning [withdrawal liability] . . . shall be resolved through arbitration"). Lastly, Marvin Hayes sought to avoid making interim payments to the pension fund. The pension fund counter-claimed, seeking an injunction compelling interim payments.

The district court declined to issue an injunction in the fund's favor because it found that the fund's calculation of Marvin Hayes' withdrawal date was erroneous. *Marvin Hayes*, 814 F.2d at 299. Thus, the court reasoned, there was no strong likelihood that the pension fund would succeed on the merits and therefore could not satisfy the first prong of the four-prong balancing test for preliminary injunctions, articulated in *Usaco Coal Co. v. Carbomin Energy, Inc.* 689 F.2d 94 (6th Cir. 1982). The district court also reasoned that § 1398 applied, and that the employer did not incur withdrawal liability because it had ceased contributions as the result of a labor dispute.

On appeal, we agreed with the district court that the pension fund chose an erroneous date for the start of withdrawal liability payments. *Id.* at 299. However, we held that this error was to be corrected by the arbitrator. *Id.* at 300. We did not decide whether § 1398 applied, but held that it was a decision also to be made by an arbitrator. *Id.* Lastly, we vacated the district court's denial of the pension fund's motion for injunctive relief, holding that it "is clear from a reading of the statutory sections dealing with withdrawal liability that the intent of Congress was to secure the funds as soon as possible and iron out the details and disputes later." *Id.* at 301. We noted at the end of

the opinion that while the case was pending on appeal, an arbitrator had ordered interim payments. *Id.* We ruled that if Marvin Hayes did not comply, the district court should enter an order "awarding interim payments, interest, and such other costs and fees as are appropriately awardable." *Id.*

The Fund argues that *Marvin Hayes* establishes that no exceptions can be made to "pay now, dispute later," and it is clear that *Marvin Hayes* pays tribute to the "pay now, dispute later" general rule. *Id.* But *Marvin Hayes* only stands for the holding that a finding of little likelihood of success is not enough to enjoin interim payments, and that instead, we must consider the "important purposes sought to be achieved by Congress in dealing with multiemployer pension plans." *Id.* However, *Marvin Hayes* does not explicitly preclude the possibility of equitable exceptions to the general rule, nor does it rule that these "important purposes" are never subjected to equitable exceptions. In short, *Marvin Hayes* only states the general rule of "pay now, dispute later," but does not address its effect on our equitable powers under Federal Rule of Civil Procedure 65. Therefore, we find that the Fund exaggerates the definitiveness of *Marvin Hayes* in the same way that Findlay exaggerates the definitiveness of *Mason & Dixon*. Neither case is dispositive as to our recognition of any equitable exceptions to "pay now, dispute later."

### 3.    Other Circuits

This leaves the question of whether the MPPAA's "pay now, dispute later" principle abrogates the courts' equitable authority squarely before this court. Because we are not bound by *stare decisis* in determining whether the "pay now, dispute later" provisions of the MPPAA abrogate the court's power to issue an injunction, we find it instructive to turn to the case law established by our sister circuits.

The Second Circuit has held that irreparable harm is sufficient to abrogate the "pay now, dispute later" rule. *T.I.M.E.-DC, Inc. v. N.Y. State Teamsters Conference Pension & Ret. Fund,* 580 F. Supp. 621 (N.D.N.Y. 1984), *aff'd*, 735 F.2d at 60 (per curiam). In *T.I.M.E. -DC*, the district court acknowledged that the MPPAA mandated

both arbitration and interim payments. *Id.* at 633 (citation omitted). But the court went on to hold that the requirements could be avoided "when the nonjudicial remedy is clearly shown to be inadequate to prevent irreparable injury." *Id.* (citation omitted). Accordingly, the court held that "the same injury [of irreparable harm] required to avoid the arbitration process is the same injury required by law for the issuance of a preliminary injunction. To the extent this Court has concluded that [the employer] has established irreparable injury in the preliminary injunction context, it has established that necessary to avoid arbitration." *Id.* (citation omitted). The court held that the employer had established that irreparable injury would occur to the employer absent the injunction because it would suggest to the public that the employer was closed and add to the employer's financial strain. *Id.* at 626-32. Accordingly, the court granted the preliminary injunction enjoining the collection of interim payments. The Second Circuit affirmed. *T.I.M.E.-DC*, 735 F.2d at 60.

The Fifth and Seventh Circuits have ruled that a court can enjoin interim payments as long as it makes (1) a finding of irreparable harm, *and* (2) a finding that the fund's claim for withdrawal liability was "frivolous." *Robbins v. McNicholas Transp. Co.*, 819 F.2d 682, 685 (7th Cir. 1987); *Trustees of Plumbers & Pipefitters Nat'l Pension Fund v. Mar-Len, Inc.*, 30 F.3d 621, 624 (5th Cir. 1994). This standard has been referred to as the *McNicholas* standard. *Mar-Len*, 30 F.3d at 625. The pension fund's claim is frivolous "if the arbitrator is almost certain to rule for the employer." *Trs. of Chicago Truck Drivers,* 935 F.2d at 119. The Fifth Circuit has adopted the same standard, holding that "where the [pension funds] bring an action to compel payment, pending arbitration, the court should consider the probability of the employer's success in defeating liability before the arbitrator and the impact of the demanded interim payments on the employer and his business." *Mar-Len,* 30 F.3d at 625-26.[6]

---

[6]We note with concern that considering the frivolousness of a fund's claim may encroach upon the arbitrator's authority under the MPPAA. To determine whether a claim is frivolous, the court must consider whether the claim is "more likely than not to have some merit." *Mar-Len*, 30 F.3d at 626 n.11. But a finding of merit is the province of the arbitrator under the MPPAA. Another concern we have is that the frivolousness test closely resembles the "likelihood of success" prong of the traditional four-prong balancing test for preliminary injunctions and therefore does not add much to the analysis. *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004) (naming the four

The First, Third, and Fourth Circuits have not explicitly ruled on whether an equitable exception to "pay now, dispute later" is allowed.  However, dicta in the cases from these circuits suggest that should there be a hypothetical exception, the threshold for meeting it would be very high.  The First Circuit has ruled:

> The MPPAA indisputably creates a "pay now, dispute later" mechanism, deeming the protection of multi-employer pension plans and their beneficiaries paramount.  This scheme puts payment ahead of decision even though the employer might prevail in the end.  Although we have therefore held that "assessed interim liability payment must be paid . . . notwithstanding a pending arbitrable dispute," *we have never squarely decided whether an equitable exception exists.*  However, in light of the clear congressional intent to protect multi-employer pension plans in withdrawal liability disputes, we have indicated that *should* an equitable exception exist, it would "require no less than the threat of imminent solvency."

*Giroux Bros. Transp., Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 73 F.3d 1, 5 (1st Cir. 1996) (citations omitted) (emphasis added).

Of all the circuits, the Third Circuit is the closest to rejecting the notion that an equitable exception to "pay now, dispute later" exists:

> We have never held that there are any equitable exceptions to the statutory provisions on interim payments, and we decline to do so now. Congress has clearly indicated its intent in this matter. The plain language of the statute declares, "Withdrawal liability *shall* be payable in accordance with the schedule set forth by the plan sponsor. . . ." 29 U.S.C. § 1399(c)(2) (emphasis added). No exceptions are provided. Our jurisdiction is limited to ordering the employer to make interim payments once the pension fund has demonstrated that it complied with the statutory requirements for calculating liability and notifying the employer. 29 U.S.C. § 1382.
>
> Notably, the two circuits which adopted an irreparable injury exception have later held that courts only have discretion to exercise it once the employer has made an affirmative showing that the pension fund lacks a colorable or non-frivolous claim. These circuits have adopted the

---

prongs of the traditional four-prong balancing test for preliminary injunctions).

equitable exception solely to ensure that the courts are not used by an unscrupulous pension fund lacking a legitimate withdrawal liability claim to squeeze money from an employer and propel it into bankruptcy.

We do not now have occasion to consider adopting a similar equitable exception. At no point in the argument of this case has [the employer] contended that the Fund's claim is frivolous or non-colorable. . . .

*Galgay v. Beaverbrook Coal Co.,* 105 F.3d 137, 140-41 (3d Cir. 1997). Therefore, while the Third Circuit states that the court's jurisdiction is "limited to ordering the employer to make interim payments," it also appears to leave room for the possibility of adopting an equitable exception.

The Fourth Circuit has also indicated than an equitable exception to "pay now, dispute later" may exist, but that the burden to qualify for the exception is "extremely high":

Generally, courts have allowed an exception to the statutory directive only where an employer makes a facial constitutional attack or shows that irreparable injury will result from being forced to make the interim payments. See, e.g., *McDonald v. Centra*, 118 B.R. 903, 922 (D.Md.1990); *Flying Tiger Line v. Teamsters Pension Trust Fund of Philadelphia*, 830 F.2d 1241, 1249 (3d Cir.1987). The burden of qualifying for this exception, however, is extremely high, for the MPPAA provides adequate safeguards to ensure that an employer will promptly recover any overpayment in the lump sum with interest. . . . In this case, [the employer] makes no assertion that irreparable harm would follow upon the imposition of withdrawal liability.

*Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 120 (4th Cir. 1991).

In summary, the Second Circuit has held that an injunction may issue upon a showing of irreparable harm by the employer. The Fifth and Seventh Circuits have held that an injunction may issue upon a showing of irreparable harm by the employer and a showing that the fund's claim is frivolous. The First, Third, and Fourth Circuits have all suggested that an equitable exception might exist, but have declined to find one factually or outline exact requirements. The Supreme Court, Eighth, Ninth, Tenth,

Eleventh, and D.C. Circuits have not addressed whether an equitable exception to "pay now, dispute later" may exist, even in dicta.

### 4.    Statutory Interpretation

To resolve this open question we turn to the plain text of the statute. The MPPAA's language appears unequivocal, and "pay now, dispute later" is established by two different provisions. "Withdrawal liability *shall* be payable in accordance with the schedule set forth by the [fund] beginning no later than 60 days after the date of the demand . . ." 29 U.S.C. § 1399(c)(2) (emphasis added). "Payments *shall* be made by the employer . . . until the arbitrator issues a final decision with respect to the determination submitted for arbitration. . . ." 29 U.S.C. § 1401(d) (emphasis added). Indeed, even though *Marvin Hayes* did not actually hold that no exceptions could possibly exist as explained previously, it did stress the clarity of the MPPAA's language: "It is *clear* that during the pendency of any dispute, however, interim payments of withdrawal liability must be made to the Plan." *Marvin Hayes Lines, Inc.*, 814 F.2d at 299 (emphasis added). "It is *clear* from a reading of the statutory sections dealing with withdrawal liability that the intent of Congress was to secure the funds as soon as possible and iron out the details and disputes later." *Id.* at 301 (emphasis added).

We follow the plain language of § 1399(c)(2) and § 1401(d) for two reasons. The first reason is that clearly-worded statutes have the power to divest courts of their equity powers. Injunctive relief, such as the relief ordered by the district court, is an exercise of equity. *Grupo Mexicano de Desarrollos S.A.,* 527 U.S. at 319 (holding that "the general availability of injunctive relief . . . depend[s] on traditional principles of equity jurisdiction") (quotations and citations omitted). The Supreme Court has ruled that "when district courts are properly acting as courts of equity, they have discretion *unless a statute clearly provides otherwise.*" *United States v. Oakland Cannabis Buyers' Co-op*, 532 U.S. 483, 496 (2001) (emphasis added). *Cf. Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) ("Moreover, the comprehensiveness of this equitable

jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command."). We agree with the Third Circuit:

> The plain language of the statute declares, 'Withdrawal liability *shall* be payable in accordance with the schedule set forth by the plan sponsor. . . ." 29 U.S.C. § 1399(c)(2) (emphasis added). No exceptions are provided. Our jurisdiction is limited to ordering the employer to make interim payments once the pension fund has demonstrated that it complied with the statutory requirements for calculating liability and notifying the employer. 29 U.S.C. § 1382.

*Galgay,* 105 F.3d at 140.[7] Although the Third Circuit ultimately retreats from making an explicit holding of no exceptions, *id*. at 141, we carry this reasoning to its conclusion: the MPPAA divests us of the jurisdiction to bar interim payments.

The second reason that we must follow the plain language of § 1399(c)(2) and § 1401(d) is that "[o]ne of the most basic canons of statutory interpretation is that a more specific provision takes precedence over a more general one." *United States v. Perry*, 360 F.3d 519, 535 (6th Cir. 2004). Although the Judiciary Act of 1789 vested district courts with jurisdiction over "all suits of a civil nature at common law or in equity," and Rule 65 of the Federal Rules of Civil Procedure provided a mechanism through which district courts could exercise the equitable power to issue injunctions, these are general provisions. In contrast, § 1399(c)(2) and § 1401(d) are specific provisions governing withdrawal liability disputes arising under the MPPAA. Therefore, § 1399(c)(2) and § 1401(d) take precedence over the court's equitable powers under the Judiciary Act and Rule 65.

---

[7]As a side note, we clarify the Third Circuit's language that "jurisdiction is limited to ordering the employer to make interim payments once the pension fund has demonstrated that it complied with the statutory requirements for calculating liability and notifying the employer." We interpret this to mean that our jurisdiction is limited to ordering the employer to make interim payments pursuant to an arbitrator's instructions. Interpretation of "pay now, dispute later" falls within the arbitrator's jurisdiction. *See Marvin Hayes*, 814 F.2d at 301. In *Marvin Hayes*, we vacated the district court order denying the fund's motion to compel interim payments, but noted that while the case was on appeal, an arbitrator had ordered interim payments. *Id.* We ruled that if the parties failed to comply with the arbitrator's order, that the district court should enter a judgment enforcing it. *Id.*

Although looking to congressional intent is unnecessary because the plain language of the MPPAA is clear on its face, it is notable that congressional intent makes irreparable harm an especially poor basis for an exception to "pay now, dispute later." In discussing the congressional intent behind "pay now, dispute later," the Third Circuit has noted:

> If companies are allowed to defer paying their debt to the pension funds, and go out of business while liability is being litigated, the pension funds will be saddled with full liability for the unfunded pension benefits. The interim payment provisions are designed to diminish this risk. We believe that it would *contort the law* if we were to allow the undercapitalized or financially precarious companies that pose the very risk to pension funds that MPPAA was designed to correct to defer payment because they pose that risk.

*Galgay*, 105 F.3d at 141 (internal citations omitted) (emphasis added). We agree. It would precisely contradict the congressional purpose of protecting funds from undercapitalized or financially precarious employers if we created an exception to interim payments for employers that would suffer irreparable harm.[8] Therefore, congressional intent, as well as the plain text of the MPPAA, discourages courts from making their own equitable exceptions to the MPPAA.

We recognize that there are some situations where interim payments may appear unfair to the employer, and will harm both parties in the long run if the employer is unnecessarily forced out of business. However, where Congress has already spoken specifically on an issue, it is not the role of this court to remedy those situations. By passing § 1399(c)(2) and § 1401(d), Congress has already decided for us that "employers *shall* make interim payments," and we must abide by the statute as long as it remains the law.

---

[8] Another way that an irreparable harm exception is inconsistent with congressional intent is that one of the purposes of the MPPAA's arbitration requirement set forth in §1401(a)(1) is to promote judicial efficiency by allowing arbitrators to develop a factual record. *Mason & Dixon*, 852 F.2d at 164. But any examination of whether irreparable harm will occur necessarily involves fact-finding. For example, the district court here examined facts about Findlay's operation size, number of employees, status of delivery operations, net loss in the past few years, and financial situation.

The Fund also argues that the district court erred procedurally in granting the preliminary injunction because it failed to address the issue of a bond. *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 539 (6th Cir. 1978) (holding that district courts must "expressly consider[ ] the question of requiring a bond" when issuing a preliminary injunction). However, because the district court lacked the authority to issue the injunction under the MPPAA, any procedural errors are moot.

**B.     Dismissal and Order to Arbitrate**

In its cross-appeal, Findlay claims that the district court erred by dismissing its claim and ordering the case to proceed to arbitration, arguing that because the withdrawal was allegedly "union-mandated," the situation was unique, and should have presented an exception to the MPPAA's arbitration requirement. Findlay also argues, alternatively, that because the withdrawal was allegedly "union-mandated," that it should fall under the protection of § 1398. The Fund claims that the district court did not err because the plain text of the MPPAA requires that the case be arbitrated.

First, we note that "arbitration reigns supreme" for withdrawal liability disputes. *Mason & Dixon*, 852 F.2d at 164 (quotation and citations omitted). The plain text of the MPPAA states that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under sections 1381 through 1399 of this title *shall* be resolved through arbitration." 29 U.S.C. § 1401(a)(1) (emphasis added). Notwithstanding, this court has recognized several exceptions to the arbitration requirement, including situations where the arbitrator would not have special expertise in interpreting the relevant statutes and where developing a factual record is not necessary. *888 Corp.,* 813 F.2d at 764 ("Judicial economy would not be served by requiring [the employer] to submit this case to arbitration only to be told by an arbitrator it had failed to make a timely demand for arbitration. Where the purposed [sic] behind the exhaustion of administrative remedies doctrine are not served, exhaustion will not be required.") (citations omitted). In light of these considerations, the Sixth Circuit has held that arbitration is not required in three specific circumstances:

(1)  an employer's "facial constitutional attack";

(2)  an employer's verifiable claim that arbitration would lead to irreparable injury;

(3)  the determination of whether a company is an "employer" within the meaning of the MPPAA.

*Mason & Dixon*, 852 F.2d at 165-67.

Findlay does not allege that its claim falls under any of these three exceptions. Instead,  Findlay argues that because this court has already recognized exceptions to the arbitration requirement, we should recognize a new exception for Findlay because its withdrawal was "union-mandated."  Findlay argues that arbitrators have not developed special expertise in adjudicating "union-mandated" withdrawal disputes.  In support of its claim, Findlay cites a study report by the PBGC, which describes "union-mandated" withdrawals as occurring only in "the rarest of circumstances."  Pension Benefit Guaranty Corporation, UNION-MANDATED WITHDRAWAL STUDY REPORT: A REPORT REQUESTED BY THE CONGRESS OF THE UNITED STATES 15 (March 1991).  However, there is a preliminary problem with Findlay's argument.  The study report defines a "union-mandated" withdrawal as requiring, *inter alia*, that the fund refuse to accept continued contributions proffered by the employer.  *Id.* at 13.  Here, Findlay did not proffer continued contributions; instead, it informed the Fund that it would not pay until the labor dispute between Findlay and Local 20 ended.  So Findlay's withdrawal cannot be characterized as the type of "union-mandated" withdrawal the study report describes as occurring only in "the rarest of circumstances."  *Id.* at 15.

Next, Findlay argues that its labor dispute falls within the scope of § 1398(2) and should therefore not be subject to the arbitration requirement.  As noted above, § 1398(2) states that "an employer shall not be considered to have withdrawn from a plan solely because . . . an employer suspends contributions under the plan during a labor dispute involving its employees."  However, we are bound by *Marvin Hayes* on the issue.  814 F.2d at 300.  In *Marvin Hayes*, the employer stopped making contributions to a multiemployer pension fund only because its employees went on a strike that ended in

the decertification of their union.  *Id.*  The district court reasoned that the labor dispute exception of § 1398 applied.  *Id.* at 299.  However, we nonetheless held that arbitration was the appropriate forum for the case.  *Id.* at 300.  ("Unless an employer is mounting a facial constitutional attack or making a verifiable claim of irreparable injury, *the courts have no jurisdiction to entertain the merits of the dispute prior to arbitration*.") (citation omitted) (emphasis added).  Whether Findlay's dispute falls within the scope of § 1398(2) is a question for the arbitrator.  The district court did not err by dismissing the case and ordering that it proceed to arbitration.

## V.  Conclusion

For the foregoing reasons, we AFFIRM the district court's dismissal, but REVERSE the district court's injunctive order.